IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs December 1, 2021

IN RE ANDREW W. ET AL.

Appeal from the Juvenile Court for Hamblen County
No. 16764-TR       Janice Hope Snider, Judge
———————————————————

No. E2021-00868-COA-R3-PT
———————————————————

A mother appeals the termination of her parental rights to three of her children. The juvenile court terminated on grounds of substantial noncompliance with the permanency plan, persistence of conditions, and failure to manifest an ability and willingness to assume custody or financial responsibility for her children. The court also determined that termination was in her children's best interest. After a thorough review, we agree and affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

W. NEAL MCBRAYER, J., delivered the opinion of the court, in which KENNY W. ARMSTRONG and KRISTI M. DAVIS, JJ., joined.

Russell Steven Veldman, Chuckey, Tennessee, for the appellant, Cassandra C.

Herbert H. Slatery III, Attorney General and Reporter, and Kristen Kyle-Castelli, Assistant Attorney General, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

OPINION

I.

A.

On November 9, 2016, the Department of Children's Services (the "Department") received a report of harm concerning three children: Andrew W., Saphira C., and

Dominic C. The principal of the school where Andrew attended kindergarten claimed that the child was not potty-trained and often came to school in soiled clothing.

The Department made several attempts to meet with the children's mother, Cassandra C. ("Mother"). When those attempts were unsuccessful, the Department petitioned the trial court for permission to investigate. Following the investigation and a failed attempt to place the children with a relative, the Department then petitioned for temporary legal custody and to find the children dependent and neglected in Mother's care.

On December 13, 2016, the court temporarily removed the three children from Mother's custody. The reasons for removal were the conditions of the home and concerns about educational and medical neglect. The medical neglect related specifically to Andrew; he had been diagnosed with celiac disease and required a gluten-free diet. Later, Mother waived the adjudicatory hearing and stipulated that the children were dependent and neglected based on drug use and lack of supervision.

Not until April 2019 did Mother make sufficient progress on a family permanency plan for a trial home placement. The court returned all three children to Mother's home, which she shared with Daniel S., the father of Dominic. But it quickly became apparent that there were problems.

Although she worked only part time, approximately 23 hours a week, Mother would take the children to the baby sitter early in the morning and would not pick them up until 9:00 or 10:00 at night. Sometimes they would spend the night with the babysitter.

The children's schooling also proved to be a problem. Mother had a hard time getting the children up and to the bus so they could arrive on time. When they did arrive, school officials reported that the children were dirty and sometimes fell asleep.

Transportation was another problem for Mother. As part of its order approving the trial home placement, the court required Mother to obtain a driver's license. Although Mother had no license, she refused to take public transportation. So she could not pick up the children's prescriptions in a timely manner or get them to their doctor appointments on time. Daniel S. could not transport the children because his license had been suspended due to a conviction for driving under the influence.

A Department family service worker, or FSW, made several surprise home visits during the trial home placement. At the beginning of the placement, Mother's home was clean. But Mother was unable to keep up with the housekeeping. Laundry would stay piled on the couch or bed. And household pets were permitted to lay on the clean laundry so that it smelled. Dishes were dirty, and toys were everywhere.

Due to these issues, on June 26, 2019, the court entered an agreed order disrupting the trial home placement. The order reflected that Mother, through counsel, acknowledged the difficulty of having all three children returned to her at once. And "[a]ll parties agreed that integrating the children slowly back into the home" would be best for all concerned.

Following the trial home placement, Mother and the FSW discussed the possibility of another placement with just one of the children to start. The Department had difficulty in determining which child should be placed with Mother first given their differing needs. But ultimately that decision became irrelevant when Mother moved and the Department experienced difficulties communicating with her.

B.

In April 2020, the Department petitioned to terminate Mother's parental rights.[1] The case proceeded to trial on three statutory grounds for termination: substantial noncompliance with the permanency plan; persistence of conditions; and failure to manifest an ability and willingness to assume custody or financial responsibility for the children.

Mother testified about the failed trial home placement. She complained that her "full-time job" prevented her from having any time with her children during the placement. It was overwhelming to start a full-time job and to have all her children in her care at the same time.[2] She admitted that the children missed the bus to school "a couple of times." But the school never told Mother that the children were falling asleep in school. Mother denied failing to take the children to their doctor appointments.

After the trial home placement, the Department contracted with an agency to facilitate visitation between Mother and the children and to assist Mother with meeting the requirements of the permanency plan. Two case care coordinators for the agency testified at trial. Mother was scheduled to have two, two-hour visits, a month. But she typically visited "maybe once a month."

In the view of the case care coordinators, Mother had not demonstrated an ability to parent the children. They both said that the visits lacked meaningful engagement between Mother and the children. Mother did not ask about the children's day or initiate activities with them. Mother did not lead any of the conversation. Instead, Mother reacted to what the children told her and did not ask follow-up questions or detailed questions.

---

[1] The petition also sought to terminate the parental rights of Daniel S. to Dominic. Daniel S. later surrendered his parental rights. The fathers of the two other children also surrendered their parental rights.

[2] Mother has a fourth child, who was still in her care.

Neither case coordinator noted any changes or improvements in Mother's parenting ability. As for the permanency plan, one coordinator testified that, through January 2021, "there really wasn't a whole lot of progress" and "still many things that were left undone." Even so, when Mother was asked if she needed anything, she replied "no."

At about the same time the petition to terminate parental rights was filed, a therapist started working with both Andrew and Saphira to help regulate their behavior and to help them process their feelings. Andrew was getting into trouble at school. He damaged a computer, talked incessantly, and disrupted his class. He had issues with "bowel holding" because of anxiety. Andrew also rocked "a great deal." Saphira struggled with low self-esteem. And she pulled her hair as an anxiety-soothing mechanism, causing a bald spot on her head.

The therapist worked with each child separately, meeting with them weekly. In those sessions, Andrew reported feeling angry about visits with Mother. And he was concerned about Mother's ability to care for him. He wanted to be adopted by his foster family. Saphira told the therapist that she was afraid to return to Mother because Mother could not take care of them. She described her foster family as a place of safety.

The children's foster family consisted of a husband and wife and their two biological children. Except for a two-year period just before the end of the trial home placement, the children had been with the same foster family since their removal from Mother's custody in December 2016.

The foster mother testified to the family's desire to adopt the children. She believed the children needed permanency. And she was concerned with Mother's inconsistency, the absence of a natural bond between Mother and the children, and Mother's lack of initiative in checking on the children and scheduling phone calls and visits.

The foster mother communicated with Mother through Facebook Messenger. She provided Mother with updates and informed her about doctor appointments and school functions. But Mother had not been to any doctor appointments and did not ask questions about the appointments. And Mother made no effort to go to school programs. Although the foster mother sent pictures of the events, Mother never asked about them.

The foster mother tried to facilitate phone calls between Mother and the children, which Mother was to initiate every Sunday. But Mother did not regularly initiate the phone calls. At most, she might call two weeks in a row. When the phone calls did take place, the foster mother noticed an impact on the children, particularly Andrew. He would act out at school. There were two years in a row that Mother forgot Andrew's birthday. Andrew made very clear that he did not want phone calls from Mother.

4

The foster mother testified about some of the challenges resulting from Andrew's celiac disease. Andrew was on a gluten-free diet and took medication for constipation. If he did not follow his diet, he could become severely constipated, requiring hospitalization. The last time he was hospitalized was about a month after returning from the trial home placement. Mother told the foster mother that Mother had given Andrew gluten because she was skeptical of his diagnosis. For her part, Mother admitted telling the foster mother that she did not believe Andrew had a gluten allergy. But Mother denied giving Andrew gluten during the trial home placement; Mother testified that she only told the foster mother about her skepticism to see if she "could trust her."

The trial court terminated Mother's parental rights. It concluded that there was clear and convincing evidence of each of three statutory grounds for termination. It also concluded that the evidence was clear and convincing that termination of Mother's parental rights was in each of the children's best interest.

## II.

A parent has a fundamental right, based in both the federal and state constitutions, to the care and custody of his or her own child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174 (Tenn. 1996); *In re Adoption of Female Child*, 896 S.W.2d 546, 547 (Tenn. 1995). But parental rights are not absolute. *In re Angela E.*, 303 S.W.3d at 250. The government's interest in the welfare of a child justifies interference with a parent's constitutional rights in certain circumstances. *See* Tenn. Code Ann. § 36-1-113(g) (Supp. 2020).

Tennessee Code Annotated § 36-1-113 sets forth both the grounds and procedures for terminating parental rights. *In re Kaliyah S.*, 455 S.W.3d 533, 546 (Tenn. 2015). Parties seeking termination of parental rights must first prove the existence of at least one of the statutory grounds for termination listed in Tennessee Code Annotated § 36-1-113(g). Tenn. Code Ann. § 36-1-113(c)(1). If one or more statutory grounds for termination are shown, they then must prove that terminating parental rights is in the child's best interest. *Id.* § 36-1-113(c)(2).

Because of the constitutional dimension of the rights at stake in a termination proceeding, parties seeking to terminate parental rights must prove both the grounds and the child's best interest by clear and convincing evidence. *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citing Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 808-09 (Tenn. 2007); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002)). This heightened burden of proof serves "to minimize the possibility of erroneous decisions that result in an unwarranted termination of or interference with these rights." *Id.* "Clear and convincing evidence" leaves "no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896,

901 n.3 (Tenn. 1992). It produces a firm belief or conviction in the fact-finder's mind regarding the truth of the facts sought to be established. *In re Bernard T.*, 319 S.W.3d at 596.

We review the trial court's findings of fact "de novo on the record, with a presumption of correctness of the findings, unless the preponderance of the evidence is otherwise." *In re Taylor B.W.*, 397 S.W.3d 105, 112 (Tenn. 2013); TENN. R. APP. P. 13(d). We then "make [our] own determination regarding whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, provide clear and convincing evidence that supports all the elements of the termination claim." *In re Bernard T.*, 319 S.W.3d at 596-97. We review the trial court's conclusions of law de novo with no presumption of correctness. *In re J.C.D.*, 254 S.W.3d 432, 439 (Tenn. Ct. App. 2007).

A.

On appeal, Mother does not challenge the statutory grounds for terminating her parental rights. Instead, Mother argues that the juvenile court "erred in finding that it was in the child[ren]'s best interest to terminate Mother's parental rights" and "erred in finding that the Department . . . had made reasonable efforts to reunite the family." Although Mother does not challenge the grounds for terminating her rights, we "must review the trial court's findings as to each ground for termination . . . regardless of whether the parent challenges these findings on appeal." *In re Carrington H.*, 483 S.W.3d 507, 525-26 (Tenn. 2016).

1. Substantial Noncompliance

One ground for termination is "substantial noncompliance by the parent . . . with the statement of responsibilities in a permanency plan." Tenn. Code Ann. § 36-1-113(g)(2). Before analyzing whether a parent complied with the permanency plan, the court must find that the permanency plan requirements were "reasonable and [we]re related to remedying the conditions that necessitate foster care placement." Tenn. Code Ann. § 37-2-403(a)(2)(C) (Supp. 2020). Permanency plan requirements may focus on remedying "conditions related both to the child's removal and to family reunification." *In re Valentine*, 79 S.W.3d at 547.

We agree with the juvenile court that the permanency plan requirements were reasonable and related to remedying the conditions that necessitated foster care. The children entered foster care due to environmental neglect and improper supervision. To address these issues, the permanency plan adopted following the trial home placement placed several requirements on Mother. Among other things, the plan required Mother to (1) complete a psychological assessment; (2) repair the weak spots in the floor of her home near the front door and bathroom for safety purposes; (3) make timely rent payments and provide proof of the same; (4) maintain a clean and appropriate home and ensure that the

6

animals are kept away from clean laundry; (5) ensure that the children attend school regularly and arrive at school on time; (6) ensure that a babysitter is utilized for the children only during work hours; (7) ensure that one adult is awake and supervising the children; (8) utilize public transportation to attend regular appointments if no other transportation is available; (9) obtain a driver's license and vehicle insurance; and (10) arrive to parent/child visits fifteen minutes early to avoid being late.

Next, we must determine whether the parent's noncompliance was substantial in light of the importance of the requirements to the overall plan. *See id.* at 548-49. "Substantial noncompliance is a question of law which we review de novo with no presumption of correctness." *Id.* at 548. A "[t]rivial, minor, or technical" deviation from the permanency plan's requirements does not qualify as substantial noncompliance. *In re M.J.B.*, 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004). Our focus is on the parent's efforts to comply with the plan, not the achievement of the plan's desired outcomes. *In re B.D.*, No. M2008-01174-COA-R3-PT, 2009 WL 528922, at *8 (Tenn. Ct. App. Mar. 2, 2009). We review the court's findings of fact concerning compliance with the permanency plan de novo with a presumption of correctness. *See In re Valentine*, 79 S.W.3d at 547.

In considering the question of noncompliance, the trial court focused its inquiry on requirements related to housing, transportation, and visits with the children. The primary reason the children were removed was because of the condition of the home. So the establishment of a stable, suitable residence was of primary concern.

When determining whether a parent's noncompliance with a plan was substantial, the court must do more than "count[ ] up the tasks in the plan to determine whether a certain number have been completed." *In re Carrington H.*, 483 S.W.3d at 537. "[T]he parent's noncompliance [must be] substantial in light of the degree of noncompliance and the importance of the particular requirement that has not been met." *In re M.J.B.*, 140 S.W.3d at 656 (citing *In re Valentine*, 79 S.W.3d at 548-59; *In re Z.J.S.*, No. M2002-02235-COA-R3-JV, 2003 WL 21266854, at *12 (Tenn. Ct. App. June 3, 2003)).

We conclude that the evidence is clear and convincing that Mother failed to substantially comply with the most important requirements of the permanency plan. The proof revealed that Mother completed a psychological assessment in October 2019, obtained a driver's license, and registered a vehicle shortly before trial. But, otherwise, the most important requirements of the plan went largely unfulfilled.

Mother never provided proof of rent payments or a rental agreement. At the time of trial, she was still living with Daniel S., but was considering moving because it was not working with him. She did not know where she would move. Mother repeatedly refused entry for unscheduled home visits. On the one occasion where the FSW was allowed in the home for a scheduled visit, the home was relatively clean, but there were still multiple dogs living in the house. And Mother showed the FSW where "field rats" were entering

7

the home but made no mention of any efforts to address the problem. At trial she seemed unconcerned because they only came into the basement.

Another important component of the permanency plan was Mother's visits with the children. Mother often missed the scheduled visits with the children, both in person and by video. Her failure to attend was so commonplace that the foster mother and case care coordinators stopped telling the children when the visits were scheduled so as not to disappoint them. And when Mother did attend, she was usually late. There was also overwhelming evidence about Mother's lack of engagement with the children during the visits.

2. Persistence of Conditions

The juvenile court also found termination of parental rights appropriate under Tennessee Code Annotated § 36-1-113(g)(3), a ground commonly referred to as "persistence of conditions." *See In re Audrey S.*, 182 S.W.3d 838, 871 (Tenn. Ct. App. 2005). The ground of persistence of conditions focuses "on the results of the parent's efforts at improvement rather than the mere fact that he or she had made them." *Id.* at 874. So the question before the court is "the likelihood that the child can be safely returned to the custody of the [parent], not whether the child can safely remain in foster care." *In re K.A.H.*, No. M1999-02079-COA-R3-CV, 2000 WL 1006959, at *5 (Tenn. Ct. App. July 21, 2000).

There are several elements to the ground of persistence of conditions. Persistence of conditions may be a basis to terminate parental rights when:

> The child has been removed from the home or the physical or legal custody of a parent . . . for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:
>
> (i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent . . . , or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent . . . ;
>
> (ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent . . . in the near future; and

(iii) The continuation of the parent . . . and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home[.]

Tenn. Code Ann. § 36-1-113(g)(3)(A). Each of the statutory elements must be established by clear and convincing evidence. *In re Valentine*, 79 S.W.3d at 550.

At the time of trial, the children had been removed from Mother's custody for well over six months. *See* Tenn. Code Ann. § 36-1-113(g)(3)(B) ("The six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard."). And this record contains clear and convincing evidence that conditions preventing reunification of Mother with her children remain. The children were removed for environmental neglect and improper supervision. And Mother still struggled to maintain a stable home. At trial, she was in the process of looking for another home. The home she lived in had "field rats" in the basement. And according to the testimony of representatives of the Department, the home smelled of urine and dog.

Mother also had not demonstrated that she could care for the children. During the short two months of the trial home placement, the children were late to school multiple times, would fall asleep while at school, and were not taken to scheduled doctor appointments. Mother admitted being overwhelmed during the placement. After the placement, Mother seemingly could not be troubled to even initiate phone conversations with her children.

Clear and convincing evidence also showed that there is little likelihood that these conditions will be remedied in the near future. The case care coordinators both testified that Mother had not made improvements in her parenting ability. And significant barriers to reunification remain. As the therapist for Andrew and Saphira testified, their lack of trust in Mother would take a substantial amount of time to overcome. "Where . . . efforts to provide help to improve the parenting abilities, offered over a long period of time, have proved ineffective, the conclusion that there is little likelihood of such improvement as would allow the safe return of the child to the parent in the near future is justified." *In re Dakota C.R.*, 404 S.W.3d 484, 499 (Tenn. Ct. App. 2012) (citation omitted).

Continuation of the parent-child relationship would also diminish the children's opportunity for an early integration into a safe, stable, and permanent home. The children have been in the same foster home for over two years since the disruption of the trial home placement. They have developed a strong bond with their foster family. The foster family wants to adopt them.

3. Failure to Manifest an Ability and Willingness to Assume Custody or Financial Responsibility for the Children

Finally, the court found termination of Mother's parental rights appropriate under Tennessee Code Annotated § 36-1-113(g)(14). Under this ground, a parent's rights may be terminated if he or she

> [1] has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and [2] placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

Tenn. Code Ann. § 36-1-113(g)(14). Both prongs must be established by clear and convincing evidence. *In re Neveah M.*, 614 S.W.3d 659, 674 (Tenn. 2020). As to the first prong, the petitioner may prove that a parent is either unable or unwilling to "assume legal and physical custody or financial responsibility of the child." *Id.* at 677.

Clear and convincing evidence shows Mother's lack of ability and willingness to assume custody and financial responsibility of the children. At trial, multiple witnesses described Mother's lack of initiative in asking about the children's welfare. She failed to attend any doctor appointments or school functions. Throughout the time that the children were in foster care, Mother missed visitation with the children, often without warning. The foster parents stopped telling the children when a visitation was scheduled because Mother was so unreliable. And when she did come to visitation, she was often late. Mother was unable to manage Andrew's celiac disease while he was in her care. Mother later told Foster Mother that she did not believe he had celiac disease.

The evidence is equally clear and convincing that placing the children in Mother's custody would pose a risk of substantial harm to their psychological welfare. Andrew and Saphira's therapist asked that visitation be stopped because both children were having psychological issues resulting from visits with Mother. Saphira had created a bald spot on her head from pulling out her hair. And Andrew was having issues controlling his anger both at home and school, as well as issues with holding his stool. Dominic, who had been in foster care since he was fifteen months old, refused to acknowledge that Mother was his mother and insisted that the foster mother was his mother. Returning children to the custody of a virtual stranger carries a risk of substantial harm. *See In re Braelyn S.*, No. E2020-00043-COA-R3-PT, 2020 WL 4200088, at *17 (Tenn. Ct. App. July 22, 2020), *perm. app. denied*, (Tenn. 2020) (reasoning that returning the child to a "virtual stranger" in light of her strong bond with her current caregivers would constitute substantial harm).

B.

Because "[n]ot all parental misconduct is irredeemable," our parental termination "statutes recognize the possibility that terminating an unfit parent's parental rights is not always in the child's best interests." *In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005). Tennessee Code Annotated § 36-1-113(i) lists nine factors that courts must consider in its best interests analysis. The "factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis." *In re Gabriella D.*, 531 S.W.3d 662, 681 (Tenn. 2017). In reaching a decision, "the court must consider all of the statutory factors, as well as any other relevant proof any party offers." *Id.* at 682. The best interest analysis is a fact-intensive inquiry, and each case is unique. *White v. Moody*, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004).

The first statutory factor focuses on whether the parent "has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent." Tenn. Code Ann. § 36-1-113(i)(1). The children were first taken from Mother's custody in 2016. She was allowed a trial home placement in 2019. But it ended for the same reasons that the children were initially taken from her. In the time between the trial home placement and the trial, Mother made virtually no improvement.

Similarly, the second factor considers the parent's potential for lasting change "after reasonable efforts by available social services agencies." *Id.* § 36-1-113(i)(2). Mother argues that the Department's efforts were not reasonable. But the evidence does not preponderate against the court's finding that they were. Before the trial home placement, the FSW went to great lengths to assist Mother including setting up logs to keep up with Andrew's health condition, going to the grocery store to get food, getting mattresses for the children, and driving Mother to add the children to her food stamp caseload. And the Department's efforts continued after the placement ended, despite resistance from Mother. Still Mother made little improvement.

The court addressed the third and fourth best interest factors, which focus on the parent's relationship with the child, together. The third factor considers the consistency of visitation. *Id.* 36-1-113(i)(3). The fourth factor asks "[w]hether a meaningful relationship has otherwise been established between the parent . . . and the child." *Id.* § 36-1-113(i)(4). Here, Mother's record of visitation and communication with her children was poor. She also lacked a meaningful relationship with the children. When Mother did come to visitation she would not engage with them. Andrew did not want to participate in visitation with Mother, and Dominic did not recognize Mother as his mother. Although Saphira loved Mother, she did not believe that Mother could care for her.

The fifth factor considers the effect a change in caregivers would have on the child's emotional, psychological, and medical condition. *Id.* § 36-1-113(i)(5). The therapist

testified in detail about the effect that the lack of permanency has had on Andrew and Saphira. They both suffer from anxiety. Dominic has not been in Mother's custody since he was fifteen months old. He would be living with a stranger if returned to Mother. The foster parents offered care and stability while Mother could not.

The seventh factor looks to see whether the parent's home environment is healthy and safe. *Id.* § 36-1-113(i)(7). The court found that Mother's home was in the same or similar physical condition as when the trial home placement was disrupted. Mother refused entry into her home for unscheduled home visits despite multiple attempts by the Department. Mother did permit scheduled home visits. When the FSW was allowed in, the FSW said the home was clean. But Mother showed her where rats were entering the home and did not say whether she had addressed the infestation. There were also still multiple dogs in the home. The evidence does not preponderate against the trial court's finding that things had not changed since the trial home placement.

The eighth factor evaluates whether the parent's mental or emotional status prevents proper parenting. *Id.* § 36-1-113(i)(8). Multiple witnesses described Mother's lack of engagement with the children during visits. She neither asked them about school nor attended their school programs. Mother also questioned Andrew's celiac diagnosis and the treatment and special diet that was necessary. Mother was unable to properly parent the children.

Lastly, the ninth factor examines the parent's child support history. *Id.* § 36-1-113(i)(9). There was no evidence regarding Mother's child support payment history, so we presume this factor did not favor termination.

Here, the combined weight of the proven facts amounts to clear and convincing evidence that termination is in the children's best interest. As the trial court observed, "[t]hese children have lived in limbo for four and a half years." Termination of Mother's parental rights provides them the earliest possible chance at permanency.

## III.

We affirm the termination of Mother's parental rights. The record contains clear and convincing evidence to support three statutory grounds for termination. We also conclude that terminating parental rights was in the children's best interest.

             _s/ W. Neal McBrayer_
             W. NEAL McBRAYER, JUDGE

12